Jack CARSWELL, Appellant,

v.

SOUTHWESTERN BELL TELEPHONE
COMPANY, Appellee.

No. 15502.

Court of Civil Appeals of Texas,
Houston (1st Dist.).

Dec. 18, 1969.

Rehearing Denied Jan. 29, 1970.

Lloyd M. Lunsford, South Houston, for appellant.

James M. Shatto, Sears & Burns, Houston, Jon Dee Lawrence, San Antonio, for appellee; Will Sears, Houston, of counsel.

BELL, Chief Justice.

In this case appellant filed suit for damages against appellee and James Francis Willis. Appellee filed its motion for summary judgment asserting there was no genuine issue of a material fact as shown by the pleadings, various specified affidavits and exhibits and the deposition of appellant. Appellant filed a reply supported by various affidavits. The court sustained appellee's motion and rendered judgment that appellant take nothing against appellee. It severed the cause of action asserted against Willis and docketed it under a different number.

The transcript is very voluminous, it consisting of 577 pages.

Appellant is and has been for many years in the business of operating a fu-

neral home. His business operation also included furnishing ambulance services. His ambulance service included furnishing emergency service. To operate an ambulance to make emergency calls within the meaning of the term as defined by statute and an ordinance of the City of Houston, a permit from the City was required, though appellant in 1965 and 1966, if not at all times, questioned the right of the City to require a permit. In the latter part of 1965, appellant differed also with the manner in which emergency ambulance calls were being dispatched by the Police Department. The dispatching of ambulances was under the direction of James Francis Willis of the Police Department. The latter part of 1965 appellant's emergency ambulance permit required by city ordinance was suspended by the Chief of Police for a period of six months. Appellant appealed to the City Council and on January 25, 1966, the Council upheld the suspension. Mr. Lee McLemore was Mayor Pro Tempore at the time. Councilman A. L. Miller made the motion to uphold the suspension. Thereafter, the exact date not being shown, appellant filed an injunction suit against the City of Houston in connection with the suspension. A hearing on the application for an injunction was held in the 133rd District Court in February, 1966. The disposition made of it by the court is not shown in the record before us. Neither is the date of disposition shown.

On May 4, 1966, the City Council passed an amended ordinance again requiring permits to operate emergency ambulance service.

The first part of April, 1966, McLemore, Miller and Willis began getting telephone calls where their respective telephones would ring but when they answered no one would respond, but the caller would hang up his telephone receiver. This continued from time to time during April and May, 1966. McLemore and Miller would receive such calls at their homes and business. Willis received such calls at his home.

These harassing calls prompted Mr. Mc-Lemore to contact Mr. Hoverstock, General Manager of the South Texas Area of appellee, for the purpose of ascertaining what could be done. Mr. Hoverstock reported the matter to Mr. Slaughter, the security man for appellee. Mr. Slaughter first contacted Mr. McLemore and as a result of his contacting Mr. McLemore, he then contacted Mr. Miller and Mr. Willis. Each party gave Mr. Slaughter authority to do whatever was necessary to find out who was making these harassing calls, including the attachment of instruments to telephone company equipment and their telephone lines and to disclose the information to the proper law enforcement agency.

Mr. Slaughter, through Mr. Croswell, Chief Switchman for appellee, made investigation as to which exchange the calls were emanating from. It was determined to be the Jackson Central Exchange. Appellant's telephone numbers are Jackson numbers and any dialing of his telephones would cause the impulses generated to go through the Jackson Central office of appellee. After this was determined, and Mr. Slaughter, knowing appellant's telephone numbers, had the switchman attach a "pen register" to one of the lines from time to time within the period later to be noticed. The pen register was attached to a line of appellant at its terminal in the Jackson Central office. The pen register will be activated by the dialing of the telephone served by the line to which the register has been attached. As the telephone is dialed the register will make a dash for each numeral dialed and this will be recorded on a tape. If the numeral dialed is "1" there will be one dash. If the numeral "7" is dialed there will be seven dashes. Between the dashes representing the first numeral dialed and the next one dialed there will be a short skip. The result is that after the full number (this includes any letters in a person's telephone number) has been dialed the tape will show what that number is. For instance, Mr. Willis' number was HO 5–3192.

When it was dialed the recording on the tape would appear substantially in this fashion: "___ ____ ___ __ _ _____ __." The pen register will not record whether the receiving telephone was answered. It cannot register any conversation. It, were it attached to the receiving line, would not in any way reflect from what telephone the dialing had come.

During the period from April 20 through April 25 two dozen calls, stated by McLemore, Miller and Willis to be annoying or harassing calls, were identified by appellee as coming through the Jackson Central office. During the period from April 26 to May 24, 1966, appellant had four business telephone numbers and an unlisted number. A pen register study was made from April 26 through April 28, from May 5 through May 9, and from May 9 through May 24 at 8 a. m. All lines were not studied at the same time. Appellant had four business telephones in his place of business, the numbers being Jackson 3-4423 through Jackson 3-4426. The fifth telephone number was unlisted and this served the home. This number was Jackson 3-4372. The study showed numerous calls from appellant's telephone to McLemore, Miller and Willis. We specially note only the calls on May 23 and 24. The tape showed eight calls to Willis' home from May 23 between 5 p. m. and 1 a. m. on May 24 that came from Jackson 3-4372. This was from the telephone in appellant's home. For the same period Miller's telephone was called seven times from Jackson 3-4372. Also for the same period of time McLemore's telephone was called four times from Jackson 3-4372.

About June 2, 1966, Mr. Slaughter, being authorized by McLemore, Miller and Willis, conferred with Mr. Richard De Guerin, Assistant District Attorney of Harris County. He told Mr. De Guerin of the complaints, the investigation made and the results of the investigation. Mr. Slaughter later, in obedience to a subpoena, testified before the Harris County Grand Jury and in County Criminal Court at Law No. 2. Nither he nor anyone acting for appellee filed any complaint against appellant.

On June 9, 1966, the Harris County Grand Jury returned an indictment against appellant charging him with having on May 24, 1966, used a telephone in a manner and with intent to harass, annoy and torment James Francis Willis, and did harass, annoy and torment Willis by calling him eight times on the telephone and terminating each call without saying anything over the telephone, the call not being for a lawful business purpose.

The indictment thus charged a misdemeanor offense covered by Article 476, Texas Penal Code.

After trial in July, 1966, appellant was acquitted. In August he filed this suit against appellee and Willis.

It is somewhat difficult to construe appellant's petition. After much careful and extensive study, we feel appellant is asserting compensatory damages against appellee on the following theories:

1. Appellant's contract with appellee for telephone service expressly and impliedly provided that all telephone calls made from appellant's telephones would be transmitted in privacy. This contractual duty was breached when the pen register intercepted all the numbers dialed and when appellee divulged the numbers to various and sundry persons, including Mr. Willis.

2. There was, by the above alleged conduct, a breach by appellee of its Constitutional duty under the Fourth Amendment to the U. S. Constitution not to invade the privacy of appellant by intercepting the telephone calls.

3. There was a violation of the Federal Communications Act, 47 U.S.C.A., Section 605.

4. Appellee and Willis in furtherance of a conspiracy to destroy appellant and

his business procured his indictment by using the information thus acquired and were guilty of malicious prosecution.

In his allegation for compensatory damages, appellant says appellee "trespassed and conducted itself as aforementioned and also breached its contract * * * causing him physical and mental pain, suffering and anguish as well as damaging his reputation and causing him business and financial losses in the sum of at least $2,000,000." Appellant had, previous to this allegation of damages, set out the theories of recovery we have mentioned. He lumped his claim for damages, not specifying the amount attributable to any particular theory.

Appellant's Point of Error No. One reads as follows: "The Court Erred in Granting Appellee's Motion for Summary Judgment."

■ We point out that this is so general that it does not comply with the rules for briefing. Rule 418, T.R.C.P. However, we are permitted to look to the statement, argument and authorities under the point to determine whether there is sufficient compliance to authorize us to consider the point. Giving a most liberal construction to the statement, argument and authorities, we have concluded that appellant by the point of error asserts there was error in granting the motion of appellee for summary judgment, because the following material fact issues were raised:

1. Whether the contract between appellant and appellee expressly or impliedly provided that appellee would transmit all calls made over appellant's telephones in privacy.

2. That the violation of this contractual duty and the divulgence of the information obtained resulted in damage to appellant.

3. Whether there was a conspiracy between appellee and the defendant Willis to wrongfully bring about the prosecution

of appellant with a view to destroying him and his business.

4. Whether appellee instituted appellant's prosecution.

5. Whether there was probable cause to institute the prosecution.

Appellant also takes the position that there was error in granting appellee's motion, because the fact that the pen register machine was attached to his telephone line and recorded the number dialed violated his right of privacy guaranteed by the Fourth Amendment to the U. S. Constitution. Further, he urges a cause of action is stated and proven, because the action of appellee in intercepting and divulging the numbers dialed violated 47 U.S.C.A. Section 605. While these latter two theories under the facts involve questions of law, appellant merely asserts them as reasons for the assertion that the trial court erred in granting appellee's motion. Appellant filed no motion for summary judgment.

■ Appellee in its response to appellant's contention on appeal dwells primarily on the thesis that appellant's suit asserted causes of action based on malicious prosecution and an alleged violation of 47 U.S.C.A. Section 605. Brief attention is given to appellant's contractual theory. Actually, as we read appellee's interpretation of appellant's suit, it is that appellant's suit is really one for damages for malicious prosecution and for a violation of 47 U.S.C.A., Section 605. We can understand such an interpretation. However, we are dealing with a summary judgment and we must construe the petition to assert the cause or causes of action contended for by the appellant if from a construction of the language we can reasonably conclude appellant's contentions concerning his pleadings are correct.

■ In passing upon whether the trial court correctly sustained the motion for summary judgment, this Court must view the record most favorably to the contestant and most strongly against the

movant. The movant has the burden of demonstrating there is no disputed issue of a material fact, and that it is entitled to judgment as a matter of law.

We affirm the judgment of the trial court.

First, we dispose of the contract theory of recovery.

The deposition testimony of appellant shows he contracted for service in 1951. In 1968, he called appellee's office to get a copy of his contract. Mrs. Van Fleet said the original was lost. She sent him a copy of what she thought was his contract. This copy, which is unsigned, contains no language expressly providing against interceptions of calls and no language from which one could imply such an agreement. It appears to us the copy sent was of the form of contract allegedly in use at the material time. It shows the name Jack Carswell and Company. Written on it in handwriting are the words "Duplicate Signature Card." It is signed at the space labeled "Taken By" in the name "Van Fleet" and is dated "5–6–68." On the form is the following language:

"Application For Service At *Houston* Exchange

"The undersigned makes application for the service and equipment shown on the reverse, and for such additional service or equipment as may be ordered later, and agrees to pay established rates for all such service and equipment. In making this application the undersigned agrees to the rules and regulations of the Telephone Company as set forth in its tariffs, and to any general change or changes in the rules, regulations, tariffs or rates for the service furnished under this application. This application becomes a contract when signed by the Manager or higher official, or upon the establishment of service."

Mr. Carswell stated that he had been searching for the contract. He stated, "I contend (the contract) * * * encompasses all of the laws, rules and regulations of the Federal Communications, and there is an implied contract (emphasis ours unless otherwise stated), in my contention, and that all I have received from the Telephone Company is a card which was sent to me by Mrs. Van Fleet, I presume. * * * She told me that that was a copy of what she thought might have been my contract, *but I don't recollect the exact wording and so forth on my contract.*"

In his affidavit in reply to appellee's motion appellant stated he had a contract with appellee to supply him with telephone service "in accordance with all the rules and regulations governing such service as promulgated by the laws and statutes of the United States and the State of Texas * * *"

We do not find in the record anything from appellee relating to the alleged contract other than the copy above referred to that was furnished by Mrs. Van Fleet.

From what we have noticed it will be seen that while in his unsworn petition appellant alleges an express and implied provision that his telephone calls will not be intercepted and divulged but will be transmitted in privacy, in his deposition he states he does not recollect the exact wording of his contract, but he is contending there is an *implied contract.* In his deposition he further states he contends his contract encompassed all laws, rules and regulations of the Federal Communications. In his affidavit he states he contends the contract entitled him to service in accordance with all the rules and regulations governing such service as promulgated by the laws of the United States and the State of Texas. Nowhere in the record or brief are any rules and regulations specified and the only laws specified are the Fourth Amendment and 47 U.S.C.A., Section 605.

We are of the view that from what we have said appellant's position is that his contract entitled him to uninterrupted

transmittal in privacy of all telephone calls that did not transgress a law, rule or regulation.

■■■ We are of the view that appellee could not validly enter into a contract that would preclude it from investigating in the manner it did here with the consent of a subscriber upon complaint from such other subscriber, and, on probable cause, to determine whether a subscriber was misusing the telephone company's facilities to make harassing calls to the complaining subscriber. Such a provision would be contrary to law and public policy. We refer specifically to 47 U.S.C.A., Section 605, and the interpretation given it in Rathbun v. United States, 355 U.S. 107, 78 S.Ct. 161, 2 L.Ed.2d 134, and other cases. As we will note later in more detail, the cases hold that the person dialed may give his consent to have another listen to the communication or make a record of it and divulge the communication. The result is, in the light of the facts to be noticed more in detail, the noting of the calls made to Miller, McLemore and Willis was not the violation of a contract as they gave their consent to appellee's actions.

What we have just said certainly precludes our finding of an implied provision which would be the equivalent of the express provision asserted.

■■■ The record does reflect that the pen register recorded all calls that were made from appellant's telephones while the pen register was on the particular line. However, the record conclusively shows that there was no divulgence of such other intercepted numbers. The numbers were recorded on tape that was seen only by Mr. Slaughter and appellee's employee, Mrs. Peggy Jarrell. She was a clerk working in the regular course of business in appellee's security division. In this instance she was working with Mr. Slaughter. The numbers of other persons which were dialed were obliterated on the tape by Mr. Slaughter. Such undisputed facts preclude a finding of any damages to appellant.

Actually, in his deposition testimony appellant's claim of damages is not for the recording of such recorded but undivulged numbers, but rather for the recording and divulgence of the calls to Miller, McLemore and Willis.

The record precludes any recovery under appellant's contract theory.

The record also precludes recovery on the theory that there was a violation of 47 U.S.C.A., Section 605. The portion of that statute applicable here reads as follows:

"* * * and no person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect or meaning of such intercepted communication to any person; and no person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by wire or radio and use the same or any information therein for his own benefit or for the benefit of another not entitled thereto."

■■■ There was no violation of this statute though appellee recorded numbers dialed from appellant's telephones that belonged to persons other than Willis, McLemore and Miller, because, as we have noted, there was no divulgence. There was, as to such other persons, an interception, but to constitute a violation of the statute there must be both an interception *and* divulgence.

■■■ There was no violation of the statute in the action of appellee's representatives in using the pen register to obtain a record of the calls made to Miller, Willis or McLemore. They were parties for whom the communications were intended and they gave their consent. It is conceded that appellant did not give his consent and knew nothing of such activity. Either party to the communication may give his consent to intercept it and if he does so there is no "interception" within the meaning of the statute. Rathbun v.

United States, 355 U.S. 107, 78 S.Ct. 161, 2 L.Ed.2d 134.

In Rathbun, a party had received a threat on his life from Rathbun via telephone. Anticipating another call the threatened party asked a police officer to listen in on an extension telephone in his home when Rathbun called again. It was held that this was no interception within the meaning of the statute, because the party called by Rathbun had consented.

After the decision in Rathbun, the case of Battaglia v. United States, 349 F.2d 556, was decided by the Court of Appeals for the Ninth Circuit. The defendant was convicted for fraud consummated through use of a telephone and by wire that crossed state lines. One telephone conversation between the defendant and the complainant was recorded with the consent of complainant. An induction coil was attached to complainant's telephone with his consent. This was done for the express purpose of using it to tape record the defendant's conversation. The recording was admitted in evidence on authority of Rathbun. The defendant sought to distinguish Rathbun because in Rathbun an extension telephone previously installed and regularly used was employed, while here the induction coil was installed for the express purpose of obtaining the recording. The appellate court held the recording was admissible and stated the mechanical nature of the method employed was not critical. See also Hall v. United States, 308 F.2d 266 (5th Cir.); Carnes v. United States, 295 F.2d 598 (5th Cir.); Mach v. United States, 352 F.2d 85 (5th Cir.); Carbo v. United States, 314 F.2d 718 (9th Cir.), and Flanders v. United States, 222 F.2d 163 (6th Cir.).

In our independent search we have found two cases involving the use of a pen register with the consent of a party who was receiving harassing calls. The telephone company placed the pen register on the defendant's line. In each case it was held there was no violation of said Section 605. People v. Schneider, 45 Misc.2d 680, 257 N.Y.S.2d 876 (N.Y.), and Harmon v. Commonwealth, 209 Va. 574, 166 S.E.2d 232.

■ There being no intercepted calls within the meaning of the statute divulgence makes no difference. Only divulgence of intercepted calls is interdicted.

The cases relied on by appellant are all cases in which neither party dialing nor the party dialed gave his consent.

■ The Fourth Amendment to the United States Constitution is inapplicable to private individuals acting on their own initiative. It is applicable to government agents. Harmon v. Commonwealth, supra; Burdeau v. McDowell, 256 U.S. 465, 41 S. Ct. 574, 65 L.Ed. 1048.

■ Here the record establishes that McLemore, Willis and Miller were acting in their individual capacities as subscribers to telephone service. McLemore and Miller sought to find out who was making the harassing calls to them at their homes and their private places of business. Willis, though a police officer, was acting in his private capacity and was seeking to find out who was disturbing the peace and tranquility of his home through the making of the harassing calls. Slaughter was acting in a purely private capacity in response to complaints from subscribers to telephone service. In fact, Mr. Carswell in his deposition testified he was relying on Mr. Slaughter's testimony that Mr. Willis came to him only in his capacity as a subscriber and that Willis acted without any police jurisdiction or authority.

The greater part of appellant's complaint is that Willis was intent on putting him out of business and that Willis conspired with appellee through its agent Slaughter to bring about appellant's indictment on the false charge of making harassing telephone calls.

The record reflects that appellant was indicted June 9, 1966 for having on or about May 24, 1966, made harassing telephone calls to Willis. After a trial he was

acquitted. While the uncontradicted evidence shows that harassing calls were made, particularly in April and May, 1966, from one of appellant's telephones, no one was able to testify that Mr. Carswell made them. Mr. Carswell denied he made any of the calls and never knew they had been made, if they had. Jerald Aaron White gave deposition testimony that he, without the knowledge or consent of appellant, made some such calls from the business telephones of Mr. Carswell and from the telephone located in Mr. Carswell's home. Mr. Carswell testified that on May 24, 1966, he was in Victoria and made a long distance call over appellee's line. [Where we use the term "testified" or "testimony" we refer to evidence in the record by way of deposition or affidavit. This being a summary judgment proceeding no oral testimony was or could be taken at the hearing. Rule 166–A(c).]

We should now notice in more detail the material testimony of the various witnesses dealing with the allegations of conspiracy and malicious prosecution.

### Mr. Lee McLemore

He was a member of the Houston City Council when the City of Houston ordinances regulating ambulances were considered and passed in 1965 and 1966. He, as Mayor Pro Tem, presided at the hearing before Council on January 25, 1966, of the appeal of Mr. Carswell from the order of the Chief of Police suspending Mr. Carswell's emergency ambulance permit for six months. He voted for the motion upholding the suspension and on January 27 he as Mayor Pro Tem signed the motion that had been passed. In the early part of 1966 he began getting harassing telephone calls at his home and place of business. (Where we use the term "harassing calls" we mean that a person's telephone would ring, the call would be answered but the caller would "hang up" without answering.) After these harassing calls, which would very frequently be during the late hours of night and early hours of morning, had continued for some months in early 1966, he complained to the security division of the Police Department. Some nights he would get 30 or 40 such calls. The person he talked to in the Police Department told him to contact the telephone company. He did not state who he talked to in the Police Department. He then called someone in the security division of the telephone company. He did not remember his name. He gave appellee's representative full authority to attach whatever instruments necessary to the telephone equipment and to his line in an effort to identify the source of the calls. He also gave full authority to disclose the information to any proper law enforcement agency. He did not know and could not testify that Mr. Carswell made the calls. He had no idea as to who made the calls.

### Mr. Arthur L. Miller

He was elected to the City Council in 1961 and was continuously councilman through 1966, this period being the period material to this case. He was present when the Council considered the appeal of Mr. Carswell from the order of the Chief of Police in suspending his emergency ambulance permit. The hearing was January 25, 1966. He made the motion to uphold the suspension. He was also present when the current (the amended one passed in May, 1966) ordinance was considered and passed. In the early part of 1966 he began getting harassing calls at his home and place of business. He kept a record beginning in April of such calls, they being noted on a blackboard. One of his grandsons later erased the record. He received more calls in April than in May. He had a record for May 18, 19, 23 and 24. On May 23 he had seven calls from 5 p. m. until 1 a. m. He called Mr. Slaughter. He gave his authority to find out who was making the calls. On May 9 he received 30 such calls on his business telephone. He gave Mr. Slaughter full authority to attach whatever instruments as were necessary to the telephone equipment and to his line to identify the source of the calls and to

disclose the information obtained to any proper law enforcement agency. He could not state Mr. Carswell made the calls. He had no animosity toward Mr. Carswell. He had only seen Mr. Carswell at City Hall and had listened to him when he appeared before the Council.

## Mr. James F. Willis

He was a Captain in the Houston Police Department. He had been in the Department since December, 1930. In 1966 one of his duties was supervision of the dispatching of police vehicles and ambulances. In March of 1966 he began getting harassing telephone calls at his home and at his business. In April he talked with Mr. Slaughter and gave him full authority to attach whatever instruments as were necessary to appellee's equipment and his line to identify the source of these calls. He also gave authority to disclose the information obtained to any law enforcement agency. About May 31 he told Mr. DeGuerin, an Assistant District Attorney of Harris County, the facts known to him about the harassing calls. Later, in response to a subpoena, he testified before the Grand Jury. On May 24 he received some harassing calls at his home. He did not know positively who the calls were from except based on information the appellee furnished him. The information showed where the calls came from. After he had been receiving these calls for about three months he went to the telephone company. He received the calls at his home. He had never known Mr. Slaughter prior to talking with him about these calls. Some one at the telephone company referred him to Mr. Slaughter. During the night of May 23, beginning about 6 p. m., and the morning of May 24 up to about 2:24 a. m. he got about 20 calls. He had never had personal differences with Mr. Carswell but they had had differences over the ambulance ordinances and the administration of them. When Mr. Slaughter contacted him, he told him about his complaint. Mr.

Slaughter asked him who he suspected and he gave a list of six possible suspects, giving names and telephone numbers. They were the names of people with the ambulance business with whom he could have had difficulty in dispatching ambulances. His relations with Mr. Carswell had been unpleasant.

## Mr. Jerry Slaughter

He is the security man for appellee. On April 20, 1966, Mr. Hoverstock told him of the complaint from Mr. McLemore. He contacted Mr. McLemore. As a result of this contact he then got in touch with Mr. Miller and Mr. Willis. Among the list of six persons given by Mr. Willis was the name of Mr. Carswell. From April 20 through April 25 at least two dozen calls of a harassing nature were made to Miller, Willis and McLemore. Through use of the pen register they were identified as originating in the Jackson Central office. He then decided to identify the "calling" number or numbers. The calls to Mr. Willis' home from Mr. Carswell's business number from May 7 through 17 aggregated 36. They came at various hours of the day and night. Beginning May 17 and ending at 1 a. m. May 24, the calls came from Mr. Carswell's *home telephone*. There was one call on May 17, 20 and 21. From May 23 from 5 p. m. to May 24 at 1 a. m. there were eight calls. As to McLemore and Miller it is sufficient to note that many such calls were made from Mr. Carswell's business telephones from May 9 to May 17. From May 17 through May 24 at 1 a. m. there were 12 calls made from Mr. Carswell's *home* telephone to Mr. Miller. Eight of these were from May 23 from 5 p. m. until 1 a. m. May 24. The calls to Mr. McLemore from Mr. Carswell's *home* telephone for the May 23–24 period were four in number. Also he received one call on May 20 and 21 from the *home telephone* of Mr. Carswell. About June 2, 1966, Mr. Slaughter conferred with Mr. DeGuerin, Assistant District Attorney of Harris

County. He told him about the facts and about the investigation and the results thereof. He later testified before the Grand Jury and at Mr. Carswell's trial. Each time he came as a witness in response to a subpoena.

Mr. Carswell admitted differences over the ambulance ordinances and administration of them. He denies making any of the calls or any knowledge of them. To show a conspiracy between appellee and Willis to prosecute him and to destroy him and his business he relies heavily on the testimony of Jerald Aaron White.

### JERALD AARON WHITE

In 1966 Mr. Willis told him that if he would help him in an experiment Willis was running on some electronic equipment Willis would help him get more ambulance business. White did as Willis told him to do by dialing the telephone of Mr. Carswell and calling the telephone numbers Willis gave him to call. He did this without the knowledge or consent of Carswell. He did not know Willis' purpose. After Mr. Carswell was indicted he notified Mr. Carswell what had happened. One number Willis gave him to call was Willis' home number. Willis asked him to help trace who was making these calls by calling certain numbers to check out this electronic equipment. White knew nothing about this equipment. He called Willis' home many many times. In answer to a question as to whether Willis told him any place to make the calls from, he answered: "Well, I better answer that that I made the phone calls from Jack Carswell's funeral home, and I made them from his house over a period of about a year prior to the indictment." When asked if he made any calls May 23 or 24, he answered, "I made so many calls on so many different dates I can't tell you the times or dates that I made them." White, on instruction of counsel for Carswell, refused to answer whether he made calls on any specific date but did say he believed he made some on May 23

but he did not know how many. He probably made them both from the place of business and the home. He also made some calls May 24. He was in the residence many times. He is certain he was there between 12:01 a. m. and 1 a. m. on May 24. Mr. and Mrs. Carswell were not in their house on May 24 when he was there.

Mr. Carswell's testimony, in addition to what we have noted, consisted in large part about his financial losses. He also testified he felt the appellee acted as it did to stay in good with the City of Houston because of City control over rates and franchises.

█ We can find nothing in the record from which an inference of conspiracy can be drawn. Mr. Carswell only asserted knowledge of a conspiracy was based on his hearing the testimony of Jerald White. White testified that he made calls which Willis asked him to make and he made them over Carswell's lines. White told no one of this until after the indictment. Willis complained to Slaughter who made an investigation in the performance of one of his usual duties. This at most would arouse a surmise or suspicion. This does not raise a fact issue. Joske v. Irvine, 91 Tex. 574, 44 S.W. 1059.

█ There is no evidence that anyone connected with appellee filed any complaint or instituted any criminal proceeding. Mr. Slaughter merely communicated the facts he had in his possession to the Assistant District Attorney. The prosecution was instituted by that officer through a grand jury investigation. Slaughter appeared before that body in obedience to a subpoena. When a citizen has information which shows the commission of a crime, it is his duty to gave such information to the proper prosecuting official. If he makes a full disclosure of the facts in his possession and the prosecuting officer thereafter brings about the prosecution, though he acts erroneously, the citizen is

protected. He has a right to rely upon the advice and action of such officer. Sebastian v. Cheney, 86 Tex. 497, 25 S.W. 691. One of the required elements for malicious prosecution is causation. Montgomery Ward & Co., Inc. v. Kirkland, 225 S.W.2d 906 (CCA), ref. n. r. e.; Burgess v. Singer Manufacturing Co., 30 S.W. 1110 (CCA), n. w. h.; Davidson v. First State Bank of Andrews, 310 S.W.2d 678 (CCA), n. w. h.; Hott v. Yarbrough, 112 Tex. 179, 245 S.W. 676.

■ Mr. Slaughter testified before the Grand Jury and at trial. On each occasion his appearance was in obedience to a subpoena. This does not create liability. Daughtry v. Blanket State Bank, 60 S.W. 2d 272 (CCA), n. w. h. A party subpoenaed is legally bound to appear and to testify if placed on the witness stand.

We are also of the view that the record establishes probable cause as a matter of law. Mr. Carswell had strenuously disagreed with the City ordinances and the administration of them. He had disobeyed them and his permit had once been suspended. He opposed the amendment to the ordinance. During the consideration of the new ordinance the harassing calls began to intensify. After its passage in early May, 1966 the calls to Miller, McLemore and Willis increased. Other ambulance operators also opposed the ordinances and their administration. However, Mr. Willis gave a list of six operators whom he suspected. Those on the list were eliminated by use of the pen register except for Mr. Carswell because only his lines were being used to call Miller, Willis and McLemore. It is also of significance that the calls made to these men from May 17

to 1 a. m. May 24 came from the line of Mr. Carswell's *home*.

■ There was probable cause as a matter of law to believe Mr. Carswell made the calls. See Sebastian v. Chaney, supra; Ramsey v. Arrott, 64 Tex. 320; Pate v. Stevens, 257 S.W.2d 763 (CCA), ref. n. r. e.; Griffin v. Chubb, 7 Tex. 603; Bekkeland v. Lyons, 96 Tex. 255, 72 S.W. 56, 64 L.R.A. 474; Moran Utilities Co. v. Childs, 392 S.W.2d 536 (CCA), ref. n. r. e.

■ Mr. Carswell stresses that he was in Victoria on May 24, the date stated in the indictment, and made a long distance telephone call. He does not state what time of day he was there. The record here shows the pen registering of calls from Mr. Carswell's home ended at 1 a. m. of that day. It is of significance that while May 24 is stated as the date of the alleged offense, the State is not limited in its prosecution to acts on that particular day but may rely on acts alleged to have occurred anterior to the return of the indictment and within the period of limitation Further, where it appears, as it does here, that a person fairly discloses the facts in his possession to the prosecuting officer, such person is protected by relying on the advice of such officer. It is not the duty of such person to make further investigation. It is the duty of the officer to investigate further if he thinks necessary. Missouri, K. & T. Ry. Co. of Texas v. Groseclose, 50 Tex.Civ.App. 525, 110 S.W. 477, n. w. h.

■ There was no abuse in the action of the trial court in severing the cause asserted against appellee from that asserted against Willis.

Affirmed.